# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3490 | **DATE** | 2/22/2002 |
| **CASE TITLE** | Anthony S. Burmistrz vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]



**DOCKET ENTRY:**

(1)  ☐   Filed motion of [ use listing in "Motion" box above.]

(2)  ☐   Brief in support of motion due _____.

(3)  ☐   Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐   Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐   Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐   Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐   Trial[set for/re-set for] on _____ at _____.

(8)  ☐   [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐   This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10)  ■   [Other docket entry]   Enter Memorandum Opinion and Order.  Defendant's motion for summary judgment [38-1] is granted and judgment is entered in favor of Defendant, City of Chicago, and against Plaintiff, Anthony S. Burmistrz, on Plaintiff's Amended Complaint.  Defendant is awarded court costs.

(11)  ■   [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 25 2002 | |
| | Notified counsel by telephone. | | date docketed | 48 |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | 2/22/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| DK | courtroom deputy's initials | | DK | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

Minute Order Form (06/97)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **ANTHONY S. BURMISTRZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 00 C 3490** |
| | ) | |
| v. | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| **CITY OF CHICAGO,** | ) | DOCKETED |
| | ) | |
| **Defendant.** | ) | FEB 2 5 2002 |

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony S. Burmistrz ("Plaintiff" / "Burmistrz") filed a two-count amended complaint against his former employer City of Chicago ("Defendant" / "City"). Count I was brought against Defendant alleging discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213. Count II alleges Defendant retaliated against Plaintiff in violation of the ADA. Defendant moves for summary judgment contending Plaintiff's claims are untimely and Plaintiff cannot establish disparate treatment, denial of a reasonable accommodation, or retaliation. Because Plaintiff's claims were untimely filed, Defendant's motion for summary judgment is granted. Additionally, Defendant articulated a legitimate non-discriminatory reason for Plaintiff's termination, this reason was not pretextual, and Plaintiff was not denied a reasonable accommodation.

## I. BACKGROUND FACTS

### A.  The Parties

Burmistrz began working as an ironworker in the City's Department of Transportation

in 1981. (Pl. Res. ¶¶ 4, 5).[1] In 1985 Plaintiff became a subforeman of ironworkers and in October 1996, his job title became foreman of ironworkers. (Pl. Res. ¶¶ 6, 7). The Defendant is the City of Chicago. (Pl. Res. ¶ 1).

## B. Plaintiff's Foreman Position

As an ironworker, Plaintiff's duties included ironwork repair to maintain bridges and roadways. (Pl. Res. ¶ 5). In 1985, he became subforeman and in 1996 he became foreman. (Pl. Res. ¶¶ 6, 7). The job duties of a foreman and subforeman are generally the same. (Def. Res. ¶ 6).[2]

The primary function of the foreman is to supervise and coordinate the work of bridge and structural ironworkers and to coordinate that work under the general direction of the Acting General Foreman of Ironworkers. (Pl. Res. ¶ 8). The foreman job is a full-time, 40 hour per week position with overtime as necessary. (Pl. Res. ¶ 10). A regular foreman's shift begins at 7:00 a.m. and concludes at 3:30 p.m. (*Id.*). Foremen are hourly employees, and under the Collective Bargaining Agreement ("CBA") between the City and the International Association of Bridge, Structural and Reinforcing Ironworkers, Local 1, the foreman and ironworkers are not granted any sick days. (*Id.*).

## C. Plaintiff's Supervisors

Plaintiff had many supervisors during his tenure with the City. Raymond Gaik was

---

[1] Pl. Res. refers to Plaintiff's Response To Defendant's Local Rule 56 Statement of Facts.

[2] Def. Res. refers to Defendant's Response To Plaintiff's Local Rule 56.1 Statement of Uncontested Facts.

Plaintiff's immediate supervisor for the last seven months of Plaintiff's employment between April and November, 1998. (Pl. Res. ¶ 11). Robert Serpe served as general foreman from the mid to late-1990's, working out of the facility where the ironworkers reported. (Pl. Res. ¶ 12). Effective April 1, 1998, Serpe was assigned to an office, and Gaik became "acting" general foreman assuming Serpe's prior duties. (*Id.*) Michael Pavichevich was a general foreman for seven and a half to eight years, before being demoted to foreman in September, 1995. (Pl. Res. ¶ 13). Pavichevich was then made acting general foreman for eight to nine months in 1996 or 1997. (*Id.*).

Stan-Lee Kaderbek is the Chief Engineer for the Bureau of Bridges and Transit within the City's Department of Transportation serving in that capacity from May 1993 to present. (Pl. Res. ¶ 14). His duties include general oversight of all day labor and bridge tender personnel, overseeing the general operations of the Bureau, and overseeing budget and personnel matters, including those of bridge and structural ironworkers and their supervisors. (*Id.*).

Robert Boskovich is the executive officer of Local 1, Ironworkers, the local union belonging to the International Association of Bridge, Structural, Ornamental, and Reinforcing Ironworkers. (Pl. Res. ¶ 15). His duties involve the operations of the local and negotiating contracts for the local. (*Id.*).

**D.    Plaintiff's Medical Problems[3]**

Burmistrz asserts he was diagnosed in 1996 with a disability known as somatization[4] disorder. (Pl. Dep. at 45, 73-74). Burmistrz also states he suffers from acute anxiety disorder and acute depression with panic disorder. (Pl. Dep. at 45). Additionally, Burmistrz claims he became sick and had various problems such as stomach problems, insomnia, and a nervous condition. (Serpe Dep. at 12). Plaintiff's illness also prevented him from attending work at times. (Pl. Dep. at 215). After periods of hard work, he claims he experienced heavy cramps in his stomach and needed to immediately use the washroom; he would then experience weakness and insomnia. (*Id.*).

**E.    Plaintiff's Supervisors' Knowledge, Or Lack Thereof, Of Plaintiff's Health**

Although Plaintiff does not remember whether or not he told any employee at the City about his diagnosis, he thinks he would have tried to have kept it quiet. (Pl. Dep. at 74). He did not recall telling any ironworkers he was suffering from a mental impairment because "that is the last thing you want them to know." (Pl. Res. ¶¶ 20, 21).

However, Plaintiff did speak with Serpe on several occasions regarding his health problems. (Def. Res. ¶ 17; Serpe dep. at 40). In 1995, Serpe noticed for the first time that

---

[3] Defendant objects to the factual assertions in this subject area; however, Defendant does not dispute that Plaintiff testified to these assertions.

[4] The process by which psychological needs are expressed in physical symptoms; e.g., the expression or conversion into physical symptoms of anxiety, or a wish for material gain associated with a legal action following and injury, or a related psychological need. Stedman's Medical Dictionary (Marjory Spraycar, Williams & Wilkins 26th ed. 1995).

4

Plaintiff was emotional, stressed, and looked like he needed sleep. (Serpe dep. at 40). In 1995 and 1996, Serpe spoke with Plaintiff's doctors regarding his health problems and satisfied himself that Plaintiff was indeed sick. (Serpe dep. at 49-57). Serpe also claims he received a note from Plaintiff's doctor explaining Plaintiff was under a doctor's care and what his treatments were. (Def. Res. ¶ 19 with objection; Serpe dep. at 59). Additionally, over the phone, Serpe states he was told Plaintiff's condition was chronic stomach disorder and the doctor used a "big word" and said it was due to stress. (Serpe dep. at 60).

Plaintiff never discussed his medical or health condition with Kaderbek. (Pl. Res. ¶ 23). Boskovich knew nothing about Plaintiff's alleged disability. (Pl. Res. ¶ 24). Pavichevich stated he knew nothing about Plaintiff's mental health, and believed Plaintiff was as sane as he was. (Pl. Res. ¶ 25). Pavichevich also does not recall being told about what medications Plaintiff was taking. (Pl. Res. ¶ 28).

Plaintiff never informed Gaik he was suffering from a disability (Pl. Res. ¶ 17); however, Pavichevich claims Gaik knew Plaintiff had stomach problems and was prone to take off work every once in a while. (Pavichevich Dep. at 83-84). Plaintiff also never informed Gaik he had a sickness or medical condition that would affect his ability to call in when he would be absent from work, nor did he ask that he not be required to call in. (Pl. Res. ¶ 19).

## F.     The Collective Bargaining Agreement

A CBA was in effect between Local 1 and the City of Chicago, from July 1, 1995

through June 30, 1999. (Pl. Res. ¶ 45). Plaintiff was covered by the CBA. (*Id.*).

The CBA states at Section 2.1 "The union recognizes that certain rights, powers, and responsibilities are solely and exclusively vested in the employer ... including the right to suspend, discipline, or discharge for just cause." (Pl. Res. ¶ 46). Furthermore, at Section 8.4, entitled "Break in Service," the CBA states "Notwithstanding the provision of any ordinance or rule to the contrary, continuous service of an employee is broken, the employment relationship is terminated, and the employee shall have no right to be rehired, if the employee ... is absent for five (5) consecutive work days without notifying the employee's authorized Employer representative unless the circumstances preclude the Employee, or someone on his behalf, from giving such notice ..." (Pl. Res. ¶ 47).

## G.    Call-In Procedure

On September 23, 1998, Kaderbek issued a memorandum to all trades staff requiring them to call 312-742-0097 before 7:00 a.m. or the start of their shift on the day they were to be absent from work. (Pl. Res. ¶ 48). This memorandum required the individual calling in to leave their name, trade, and the reasons for their absence on the voice mail. (Pl. Res. ¶ 49). Additionally, the memorandum stated calling one's supervisor did not relieve one from calling 312-742-0097, nor would calls to supervisors meet the requirements of this policy. (*Id.*). Furthermore, calls recorded after 7:00 a.m. or the start of one's shift would be noted as "Absent/No Pay-No Call" and be considered unapproved absences which may result in disciplinary action. (Pl. Res. ¶ 50). The memorandum also indicated "[p]ursuant to the

City/Labor Coalition Agreement, more than five continuous days of 'Absent/No Pay-No Call' shall constitute a break in service and separation proceedings will commence against the employee." (*Id.*). Plaintiff believes he took this memorandum off the bulletin board at work, copied it, and returned it to the bulletin board. (Pl. Res. ¶ 53).

On September 28, 1998, Kaderbek issued another memorandum regarding the call-in line because the previous memorandum stated an incorrect telephone number. (Pl. Res. ¶ 51). The memorandum stated the correct call-in number as 312-742-0092 and reiterated when individuals were to call in. (*Id.*). Plaintiff also took this memorandum off the bulletin board at work when he saw it had a call-in number. (Pl. Res. ¶ 54).

## H.    Plaintiff's Absences

Plaintiff claims he could not predict when he could not go to work. (Def. Res. ¶ 14). He asserts his "flare-ups," times he could not go to work, would last from a couple of days to two to three weeks. (Pl. Res. ¶ 44).

In 1997, Plaintiff took 24 full days of unpaid leave. (Pl. Res. ¶ 37). Of these, there may have been days Plaintiff did not call in. (Pl. Res. ¶ 36). Between March 5 and 31, 1997, Plaintiff took 19 consecutive vacation days off work and between April 1 and 15, 1997, Plaintiff took 11 consecutive days of unpaid leave. (*Id.*). Plaintiff was absent for 11 consecutive work days from December 3 to 17, 1997 using unpaid leave. (Pl. Res. ¶ 38).

Plaintiff was frequently absent from work between April and November, 1998 and rarely, if ever, called in to report he would be absent. (Pl. Res. ¶¶ 33-34). In 1998, Plaintiff

took 40 days of unpaid leave. (Pl. Res. ¶ 39). He was absent from work 12 consecutive work days between April 3 and 17, 1998, using a combination of six vacation days and six days of unpaid leave. (Pl. Res. ¶ 40). He was absent from work for 10 consecutive work days between June 1 and 12, 1998, using a combination of two vacation days and eight days of unpaid leave. (Pl. Res. ¶ 41). Plaintiff also took unpaid leave days from July 21-24, August 24-26, September 14-21, October 6-8, October 23-26, November 4, and November 9-16, 1998. (Pl. Res. ¶¶ 42-43).

## I.  Plaintiff Fails To Call Between November 9-16, 1998

Plaintiff was absent from work on November 9-16, 1998, and claims he called the call-in line to notify the Bureau he would be absent. (Pl. Res. ¶¶ 58-63). Plaintiff asserts he called between 6:00 a.m. and 7:00 a.m., and when he called, he heard a noise like a ring, a click and a beep, then nothing; he stated his name, he was an ironworker, and he was sick with an ongoing problem, then hung up the telephone. (*Id.*).

Plaintiff's home telephone number on August 9, 2001 was 773-978-0562 and Plaintiff did not recall having a different telephone number from this number between November 1998 and August 9, 2001. (Pl. Res. ¶¶ 55, 57). Furthermore, neither Plaintiff nor his wife had a cellular telephone in 1998. (Pl. Res. ¶ 56). Plaintiff asserts all the phone calls he made to the call-in line between November 9 and 16, 1998 were made from the home phone located in his bedroom. (Pl. Res. ¶ 64).

Plaintiff obtained telephone records from the telephone company for his home phone

number for November 1998. (Pl. Res. ¶ 65). These telephone records reflect Plaintiff failed to call either 312-742-0092 or 312-742-0097 on November 9, 10, 11, 12, 13, or 16, 1998 before 7:00 a.m. (Pl. Res. ¶ 66).

Prior to November 9-16, 1998, however, after the September 1998 memoranda were posted, Plaintiff did call 312-742-0092 to report his absences. (Pl. Res. ¶¶ 69-71). On October 6, 7, and 23, 1998, Plaintiff called 312-742-0092 to call in sick. (*Id.*). Plaintiff did not believe that he should have been allowed to not have to call in when he would be absent. (Pl. Res. ¶ 73).

Between April and November 1998, Gaik was Plaintiff's immediate supervisor and he would generally assign Plaintiff to the "emergency truck" with an ironworker whom Plaintiff would supervise. (Pl. Res. ¶ 77). When Plaintiff was absent, an ironworker would be made "acting" foreman, and thus would be entitled to receive foreman pay for the days he served in that capacity. (Pl. Res. ¶ 79). This required Gaik to complete additional paperwork to ensure the "acting" foreman would receive foreman pay for those days he served as "acting" foreman in place of Plaintiff. (*Id.*).

## J. Plaintiff's Termination

On November 16, 1998, Kaderbek became aware, after reviewing time records, Plaintiff was absent for six consecutive work days without using the call-in line. (Pl. Res. ¶ 85). On or about November 16, 1998, Kaderbek directed Florence Hooker, Director of Staff Services for the Department of Transportation, to send Plaintiff a letter indicating he

had been absent November 9, 10, 11, 12, 13, and 16, and because he failed to comply with Section 8.4 of the CBA, his employment was terminated at the close of business on November 13, 1998. (Pl. Res. ¶ 86). Kaderbek did not consult with any of Plaintiff's supervisors or co-workers prior to deciding Plaintiff should be terminated. (Pl. Res. ¶ 87).

On November 20, 1998, when Plaintiff arrived at work, he was orally informed he was fired. (Pl. Res. ¶ 89). Also on that date, Plaintiff received a letter from the City Department of Transportation, dated November 16, 1998, indicating he was absent November 9, 10, 11, 12, 13, and 16, and because Plaintiff failed to comply with Section 8.4 of the CBA, his employment was terminated at the close of business on November 13, 1998. (Pl. Res. ¶ 90; Burmistrz Dep. Ex. 13). This letter stated "[i]f in fact you were not absent, or believe this provision of the labor contract is not applicable to your situation, you should make a written response to this letter within ten (10) days of receipt containing as much detail as possible," and further stated such response should be directed to Stan-Lee Kaderbek. (Pl. Res. ¶ 91; Burmistrz Dep. Ex. 13). The letter Plaintiff received on November 20, 1998 "stated clearly that [he] was terminated." (Pl. Res. ¶ 92; Burmistrz Dep. Ex. 13).

On November 23, 1998, Plaintiff typed a written response to Kaderbek, stating "[o]n November 20, 1998, while reporting to work at 6:50 a.m., I was told by the Department of Trans. tradesmen that I was fired." (Pl. Res. ¶ 93). Also in this letter, Plaintiff stated between November 9 through 18, 1998, he called in, let the phone ring, it clicked and beeped, Plaintiff then indicated he stated his name, "ironworkers," and that he was sick from an

ongoing problem before hanging up the phone. (Pl. Res. ¶ 94). Plaintiff went on to state in

this letter "[m]y last wish was that I would have to file a lawsuit, outlining the many

problems we have had in the past ... I have, this day, secured legal council [sic] and will

move in this direction ... I believe this report will be reasuring [sic] as to my honesty and for

future litigation." (Pl. Res. ¶ 95). Because the call-in logs reflected Plaintiff violated the

CBA and the Bureau's call-in procedure by not calling in to the centralized line when he was

absent from November 9-16, 1998, Burmistrz was not reinstated. (Pl. Res. ¶ 96).

## K.   Plaintiff's Dealings With The Union

On December 18, 1998, Plaintiff wrote a letter to Local 1 officials stating "on

November 18th I received a letter stating that I was fired from the City of Chicago,

Department of Transportation. It stated under section 8.4 of the collective bargaining

agreement that I was absent five days without notifying an authorized supervisor. I called

into an answering machine (from a number I was given on a paper) everyday. The

termination letter asked me for a response, so I sent the enclosed response and received

nothing as an answer. Therefore I am petitioning Local 1 officers to file a lawsuit on my

behalf for wrongful termination." (Pl. Res. ¶ 97). In this letter, Plaintiff meant to say he

knew he had been fired on November 20, 1998, not November 18, 1998. (Pl. Res. ¶ 98).

Plaintiff also testified he "believe[d] the City of Chicago, Department of Transportation

supervisors terminated [him] before the union could be involved." (Pl. Res. ¶ 99).

Upon receipt of Plaintiff's letter, Boskovich, on behalf of Local 1, responded to

Plaintiff by letter dated December 21, 1998, informing Plaintiff he was "advised to appear before the Executive Board at 6:00 p.m. on Monday, December 28, 1998. This meeting is in response to your letter dated December 18, 1998 and is being held on an emergency basis." (Pl. Res. ¶ 100). As requested, Plaintiff appeared before the Local 1 Executive Board on December 28, 1998. (Pl. Res. ¶ 101). At this meeting, Boskovich asked Plaintiff if he wanted Local 1 to file a lawsuit on his behalf, and Plaintiff stated he did not, as he felt his own attorney would do a better job. (Pl. Res. ¶ 102).

## L.   Plaintiff's EEOC Charge

Plaintiff's Amended Complaint indicates he filed a charge with the Equal Employment Opportunity Commission ("EEOC"), concerning his discharge, on November 22, 1999. (Pl. Res. ¶ 103). However, Plaintiff's EEOC Charge of Discrimination contains a stamped date of October 13, 1999. (Pl. Res. ¶ 104). Plaintiff cannot recall whether he filed his EEOC charge on October 13, 1999 or November 22, 1999. (Pl. Res. ¶ 105).

In Plaintiff's EEOC charge, at paragraph 7, Plaintiff stated "[e]mployers finalized Complainant's termination on December 28, 1998." (Pl. Res. ¶ 106). Additionally, in the box titled "DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (month, date, year)," Plaintiff wrote December 28, 1998. (Pl. Res. ¶ 107). When Plaintiff was questioned regarding the date December 28, 1998 appearing on his EEOC charge, he testified "maybe they made a mistake on writing the date up." (Pl. Res. ¶ 109). Furthermore, when Plaintiff was asked "[d]o you have any reason to believe that you were

terminated in December of 1998 because of your need of accommodation, or is it as you testified earlier that it was actually November 20th," Plaintiff replied "I was terminated in November." (Pl. Res. ¶ 110). Thus, Plaintiff stated the December 28, 1998 statement in the complaint was inaccurate. (*Id.*).

## II. SUMMARY JUDGMENT STANDARD

Defendant moves for summary judgment on the issues of whether Plaintiff's claim was timely filed and whether Defendant discriminated and retaliated against Plaintiff in violation of the ADA. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Sinkler v. Midwest Prop Mgmt. Ltd. P'ship*, 209 F.3d 678, 682-83 (7th Cir. 2000). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. *Sinkler*, 209 F.3d at 683; *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998).

The movant bears the burden of establishing that there exists no genuine issue of material fact. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2554 (1986). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56 (c); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2549. Rule 56(c)

mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2547. A fragment of evidence in support of the non-movant's position is insufficient to successfully oppose a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *252,* 106 S. Ct. 2505, 2512 (1986). This burden must be met by appropriate citations to relevant evidence and cannot be met with conclusory statements or speculation. *Brasic v. Heinemann's Inc., Bakeries,* 121 F.3d 281, 286 (7th Cir. 1997).

Weighing evidence, deciding credibility, and inferring reasonable deductions are responsibilities for a jury and not for a judge to decide in making a summary judgment determination. *Anderson,* 477 U.S. at 255, 106 S. Ct. at 2513.

## III.  ISSUES TO BE DECIDED

Defendant's motion for summary judgment raises the question of whether material issues of fact exist regarding the following issues: 1) whether Plaintiff's claims were timely filed with the EEOC; 2) whether Plaintiff can establish the elements of a prima facie case of disparate treatment under the ADA; 3) whether Plaintiff was denied a reasonable accommodation under the ADA; and 4) whether Plaintiff was retaliated against in violation of the ADA.

## A.    Plaintiff's Claim Was Not Timely Filed With The EEOC

Defendant first argues Plaintiff's ADA claim is time barred because Plaintiff did not file his charge with the EEOC within 300 days of the occurrence of a discriminatory action. The Court agrees. The ADA adopts the enforcement procedures governing Title VII actions, including the filing procedures and timing requirements. *See*, 42 U.S.C. § 12117(a). Under Title VII and the ADA, an Illinois claimant must file a complaint before the EEOC within 300 days of the occurrence of the alleged discriminatory action.[5] 42 U.S.C. § 2000e-5(e) and § 12117(a); *Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 707 (7th Cir. 1995). Failure to file within the 300 days renders the charge untimely and the claimant is precluded from bringing the claim in court. *Koelsch*, 46 F.3d at 707.

The "limitations period begins to run on the date that the defendant takes some adverse personnel action against the plaintiff, and not when the full consequences of the action are felt." *Davidson v. Indiana-American Water Works*, 953 F.2d 1058, 1059 (7th Cir. 1992) *citing Delaware State College v. Rick*, 449 U.S. 250, 258, 101 S.Ct. 498, 504 (1980). The 300 day limit begins running when the defendant takes the action that injures the plaintiff and when the plaintiff knows he was injured, *see Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001), "not when he determines that the injury was unlawful."

---

[5] Under the applicable federal statute, a plaintiff has 180 days to file his claim, unless the forum state has an administrative agency to which the EEOC deferes ("deferral state"). Illinois has such an agency – the Illinois Department of Human Rights ("IDHR") – making the time limit 300 days rather than 180 days. *Speer v. Rand McNally & Co.*, 123 F.3d 658, 662 n. 1 (7th Cir. 1997).

*Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995).

In this case, the date of the adverse personnel action was the date of Plaintiff's termination, November 20, 1998. On November 20, 1998, Plaintiff reported to work at 6:50 a.m. and was informed by co-workers he had been terminated. Plaintiff also received a letter on November 20, 1998, at his home, explaining why the City terminated him. However, Plaintiff did not file his EEOC charge until October 13, 1999, 327 days after the adverse personnel action.

Plaintiff had knowledge of his injury and its alleged unlawfulness more than 300 days before he filed his EEOC charge. Plaintiff testified he in fact received the letter and it "stated clearly that [he] was terminated." More importantly, Plaintiff responded to the letter by writing his own letter, dated November 23, 1998, to Kaderbek. In Plaintiff's letter to Kaderbek, he explained how he was informed he was fired. Plaintiff also made remarks indicating he understood an adverse personnel action was taken against him on November 20, 1998. Also in Plaintiff's letter to Kaderbek, he stated "[m]y last wish was that I would have to file a lawsuit, outlining the many problems we have had in the past ... I have, this day, secured legal council [sic] and will move in this direction ... I believe this report will be reasuring [sic] as to my honesty and for future litigation." Although *Thelen* states the date a plaintiff's action accrues is when he discovers he has been injured and not when he determines his termination is unlawful, 64 F.3d at 267, in this case, Plaintiff fully discovered both that he had been injured and that the termination was allegedly unlawful, on November

20, 1998.

Plaintiff claims the adverse personnel action occurred on December 28, 1998 - the date of the meeting before the Executive Board of Local 1- and, therefore, he filed his EEOC charge on October 13, 1998, 289 days later. Plaintiff is mistaken. This meeting was held in response to Plaintiff's letter to Local 1 officials. At this meeting, Boskovich asked Plaintiff if he wanted Local 1 to file a lawsuit on his behalf. Plaintiff stated he did not, as he felt his own attorney would do a better job than a union attorney. Thus, both Local 1 and Plaintiff were aware the adverse personnel action had already occurred prior to this meeting by their reference to filing a lawsuit.

Plaintiff also fails to address any exceptions to the 300 day limit. Even had Plaintiff raised the exception of equitable estoppel – where "the defendant takes active steps to prevent the plaintiff from suing in time, ... such as by hiding evidence or promising not to plead the statute of limitations," *Speer v. Rand McNally & Co.*, 123 F.3d 658, 663 (7th Cir. 1997) – it would have been denied.

The Seventh Circuit holds providing "opportunities for internal review is not the sort of deception that supports equitable estoppel." *Id.* Furthermore, when an "employer provides an avenue ... for review of adverse employment actions, without more, the doctrine of equitable estoppel is not applicable." *Sharp*, 236 F.3d at 372. Lastly, "pursuing a grievance via an internal grievance proceeding does not postpone accrual of a claim under Title VII." *Id.* at 373. This case law directs that the clock does not stop ticking because the

employer offers an avenue for grievance. Even though, in this case, it was the union, not the employer, who provided an avenue for grievance, the clock still does not stop ticking. Therefore, Defendants motion for summary judgment is granted because Plaintiff's EEOC charge was not timely filed.

## B. Plaintiff Was Not Discriminated Or Retaliated Against In Violation Of The ADA

Even had Plaintiff's EEOC charge been timely filed, Plaintiff still would not have survived summary judgment. Defendant had a legitimate non-discriminatory reason for Plaintiff's termination that was not pretextual and Plaintiff was not denied a reasonable accommodation.

### 1. Defendant's Reason For Plaintiff's Termination Was Legitimate, Non-Discriminatory, And Not Pretextual

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees." 42 U.S.C. §12112(a). When, however, plaintiff is unable to show any direct evidence of discrimination, as in this case, plaintiff must instead indirectly demonstrate discrimination through the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973). *See e.g., Leffel v. Valley Financial Services*, 113 F.3d 787, 792 (7th Cir. 1997). The burden of establishing a *prima facie* case of discrimination rests with the plaintiff. *Id.*

To establish a *prima facie* case of discrimination under the ADA and survive summary judgment, Plaintiff is required to prove: 1) he is disabled within the meaning of the ADA;

2) he was qualified for the position of foreman of ironworkers; 3) he was subjected to an adverse employment action; and 4) the circumstances surrounding the adverse action indicate it is more likely than not his disability was the reason for the adverse action. *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001); *Weigel v. Target Stores*, 122 F.3d 461, 465 (7th Cir. 1997); *DeLuca v. Winer Industries*, 53 F.3d 793, 797 (7th Cir. 1995). If Plaintiff is able to prove a *prima facie* case, then the burden shifts to the City to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. *Lawson*, 245 F.3d at 922-23. If the City is able to do so, the burden shifts back to Plaintiff to show the City's reason for termination is a pretext for discrimination. *Id.* at 923.

Similar to a claim for discrimination, a plaintiff bringing a retaliation claim can use indirect evidence under the burden-shifting method of *McDonnell Douglas*. A plaintiff must first establish a *prima facie* case of retaliation. *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001), *cert. denied* 122 S.Ct. 62 (2001). If the plaintiff succeeds, the defendant must articulate a legitimate and nondiscriminatory reason for its adverse action. *Id.* The burden then shifts to plaintiff to show this reason is a pretext for unlawful retaliation. *Id.*

Even assuming Plaintiff was able to prove a *prima facie* case of discrimination and retaliation, the City was able to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination and Plaintiff was unable to prove that reason was pretextual. "It is well-established that an employee can be terminated for violations of valid work rules that apply to all employees, even if the employee's violations occurred under the influence of a

disability." *Pernice v. City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001). Furthermore, an employer is not "bound to retain all apparently tardy and lazy employees on the chance that they may have a disability that causes their behavior." *Hedberg*, 47 F.3d at 934.

The CBA covering Plaintiff's employment with the City provides, at Section 2.1, the right to terminate employees is solely and exclusively vested with the City. Moreover, the parties agree Plaintiff was terminated for violating Section 8.4 of the CBA, which states an employee shall be terminated and not rehired "if the employee ... is absent for five (5) consecutive work days without notifying the employee's authorized Employer representative ...," and the Bureau's call-in procedures.

Effective on September 28, 1998, Kaderbek issued a policy memorandum implementing a call-in procedure for trades staff. This memorandum required ironworkers to call 312-742-0092 before 7:00 a.m. or the start of their shift on days they were to be absent from work. The memorandum indicated "[p]ursuant to the City/Labor Coalition Agreement, more than five continuous days of 'Absent/No Pay-No Call' shall constitute a break in service and separation proceedings will commence against the employee." Plaintiff made a copy of the memorandum and was aware he was to call in to the centralized call-in phone number prior to 7:00 a.m. on days he was to be absent from work. In fact, on three occasions in October 1998, Plaintiff used the call-in line to inform the Bureau before 7:00 a.m. he would be absent.

The telephone records and evidence make it clear Plaintiff was absent from work

November 9-16, 1998 and he did not use the call-in line to report his absences on these days. Plaintiff contends he called in each day on his home telephone located in his bedroom; however, the Plaintiff's home telephone records he obtained from the telephone company directly controvert this assertion. The telephone records for Plaintiff's home telephone reflect a failure to call the designated call-in line on any of the dates in question.

The City established a legitimate, non-discriminatory reason for Plaintiff's termination; namely, Plaintiff violated the break in service provision of the CBA and the Bureau's September 1998 call-in policy. The burden now shifts to Plaintiff to establish Defendant's reason is pretextual. *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999). Plaintiff may accomplish this by showing Defendant's proffered reasons are "factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Id.*

Plaintiff believes his termination was pretextual because he contends one other employee, Mario Tornicasa, violated the break in service provision prior to Plaintiff and was not terminated. Plaintiff is mistaken. Tornicasa's ten consecutive absent days took place from August 20 to September 2, 1998. According to the records of Chief Timekeeper Baxter, Tornicasa was serving a suspension from August 20 through September 2, 1988, and, therefore was not required to call in. Regardless, Tornicasa's absences occurred prior to Kaderbek's September 28, 1998 memorandum expressing the new more stringent call-in procedure requirement. Moreover, it is undisputed between October 1998 and July 2001,

five other members of the trades were terminated for violating the call-in policy, including foreman of ironworkers Scott Rogers who was terminated effective February 1999 for being absent from work for five consecutive days without notifying the Bureau. When asked about this at oral argument, Plaintiff responded the five additional terminations occurred to "cover-up" Plaintiff's termination based on his disability. No factual basis was provided for this assertion.

Because Defendant was able to present a legitimate non-discriminatory reason for Plaintiff's termination and because Plaintiff was unable to show this reason was pretextual, Defendant's motion for summary judgment is granted.

### 2. Plaintiff Was Not Denied A Reasonable Accommodation For A Known Disability

Plaintiff was terminated for failing to call-in to notify Defendant he would be absent. Contrary to Plaintiff's belief, he was not terminated for being absent or for excessive absenteeism. Nothing in the record suggests Plaintiff ever requested or was given an accommodation of not being required to notify the City when he would be absent. Plaintiff himself did not believe he should have been allowed not to call in when he would be absent. Therefore, Plaintiff was not denied a reasonable accommodation and Defendant's motion for summary judgment is granted.

## IV. CONCLUSION

This case raises no fact questions for a jury to decide. Plaintiff's EEOC charge was not timely filed, Defendant articulated a legitimate non-discriminatory reason for Plaintiff's termination that was not pretextual, and Plaintiff was not denied a reasonable accommodation. For the foregoing reasons, **Defendant's motion for summary judgment is granted and judgment is entered in favor of Defendant, City of Chicago, and against Plaintiff, Anthony S. Burmistrz, on Plaintiff's Amended Complaint. Defendant is awarded court costs.**

**SO ORDERED THIS 22nd DAY OF FEBRUARY, 2002.**

**MORTON DENLOW**
**United States Magistrate Judge**

**Copies mailed to:**

Herbert H. Victor
Michelle Roberts
30 North LaSalle Street
Suite 3400
Chicago, Illinois 60602

Nadine C. Abrahams
Senior Counsel
Mario Utreras
Assistant Corporation Counsel
Corporation Counsel of the City of Chicago
30 North LaSalle Street
Suite 1020
Chicago, Illinois 60602

**Attorneys for Plaintiff**

**Attorneys for Defendant**

23